### In re CHARGE TO GRAND JURY.

(District Court, N. D. California.    February 15, 1895.)

INTERSTATE COMMERCE—UNJUST DISCRIMINATION—FREE PASSES.

An officer of a railroad company engaged in interstate commerce who, as a matter of personal favor, issues to a person not within any of the exceptions contained in section 22 of the interstate commerce act a free pass for transportation from one state to another, is guilty of unjust discrimination, in violation of sections 2 and 3 of that act.

MORROW, District Judge (charging jury).    You have been summoned and sworn as grand jurors of the district court of the United States for the Northern district of California.    It now becomes the duty of the court to give you some instructions concerning the duties you will be called upon to perform under the laws of the United States.    By the constitution of the United States, no person can be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces or in the militia, when in actual service in time of war or public danger.    Your duties are therefore not only highly important to the community, but they require, on your part, the exercise of patience in the careful investigations of charges against persons accused, and firmness and judgment in presenting offenders for prosecution.    It is not my purpose to call your attention to all the cases or matters you will be called upon to examine, but it is incumbent upon me to direct your attention to one subject that has come under the observation of the court, relating to railroad transportation, under the law concerning interstate commerce.

The act of congress entitled "An act to regulate commerce," approved February 4, 1887, provides in section 1 as follows:

"That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment, from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the District of Columbia," etc.

Section 2 provides as follows:

"That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

Section 3 provides as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or

any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business." 24 Stat. 379.

### Section 10, as amended by the act of March 2, 1889, provides as follows:

"That any common carrier subject to the provisions of this act, or, whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person, acting for or employed by such corporation, who, alone or with any other corporation, company, person, or party, shall willfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter, or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, or shall willfully omit or fail to do any act, matter, or thing in this act required to be done, or shall cause or willingly suffer or permit any act, matter, or thing so directed or required by this act to be done not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this act, or shall aid or abet therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not to exceed five thousand dollars for each offense: provided, that if the offense for which any person shall be convicted as aforesaid shall be an unlawful discrimination in rates, fares, or charges, for the transportation of passengers or property, such person shall, in addition to the fine hereinbefore provided for, be liable to imprisonment in the penitentiary for a term not exceeding two years, or both such fine and imprisonment, in the discretion of the court." 25 Stat. 857.

These provisions of the law respecting unjust discrimination are qualified by the provisions of section 22, as amended by the act of March 2, 1889, as follows:

"That nothing in this act shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States, state, or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat, or the free carriage of destitute and homeless persons transported by charitable societies, and the necessary agents employed in such transportation, or the issuance of mileage, excursion, or commutation passenger tickets. Nothing in this act shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion, or to municipal governments for the transportation of indigent persons, or to inmates of the national homes or state homes for disabled volunteer soldiers and of soldiers' and sailors' orphan homes, including those about to enter and those returning home after discharge, under arrangements with the boards of managers of said homes. Nothing in this act shall be construed to prevent railroads from giving free carriage to their own officers and employees, or to prevent the principal officers of any railroad company or companies from exchanging passes or tickets with other railroad companies for their officers and employees. * * *" 25 Stat. 862.

The interstate commerce commission was created by virtue of section 11 of this same act to regulate commerce, approved February 4, 1887. It is endowed with the authority of investigating charges against any common carrier subject to the provisions of the act and the acts amendatory thereof, for any violations by such common carrier of any of the provisions contained in said acts.

This commission has considered the question as to whether the granting of transportation to persons free or at reduced rates constituted a violation of the provisions I have just read to you.

In Re Boston & M. R. Co., 5 Interst. Commerce Com. R. 69, it was held by the commission, on December 29, 1891, that it was a violation of the act to regulate commerce, and therefore an unjust discrimination, for the Boston & Maine Railroad Company to issue passes entitling the holders to free transportation over the lines of its system, extending into the states of Maine, New Hampshire, Vermont, and Massachusetts, where such persons did not come within the exceptions specified by section 22 of the act, as it is amended by the act of March 2, 1889, but were gentlemen whose claim for the privilege of free transportation was based upon the fact that they were long eminent in the public service, higher officers of the states, prominent officials of the United States, members of the legislative railroad committees of the above-named states, and persons whose good will was claimed to be important to the defendant.

The same question was again considered by the commission in the case of Harvey v. Railroad Co., 5 Interst. Commerce Com. R. 153, where the conclusions reached in Re Boston & M. R. Co., supra, were decisively and unequivocally reaffirmed. Commissioner Martin A. Knapp, of New York, who delivered the report and opinion of the commission, used the following language:

"The fundamental and pervading purpose of the law is equality of treatment. It assumes that the railroads are engaged in a public service, and requires that service to be impartially rendered. It asserts the right of every citizen to use the agencies which the carrier provides on equal terms with all his fellows, and finds an invasion of that right in every unauthorized exemption from charges commonly imposed. No form of favoritism and no species of partiality seems more odious or indefensible than that which accords to personal influence or public station privileges not enjoyed by the community at large. The free carriage of certain persons merely because they occupy official positions, or have acquired some measure of distinction, offends the rudest conception of equality, and contravenes alike the policy and the provisions of the statute. The practices complained of in this proceeding are illegal, and must receive our condemnation."

The order of the commission reads as follows:

"The order of the commission is that the defendant forthwith cease and desist from granting free passes or otherwise furnishing free transportation over its interstate lines, except as provided in the twenty-second section of the act."

You will observe, gentlemen of the grand jury, from the provisions of the statutes, as well as the conclusions respecting the construction of such provisions reached by the interstate commerce commission, that it was the intent of congress to prevent unjust discrimination in charges or rates for transportation of persons or property by any common carrier engaged in interstate commerce, and that the issuing of passes, entitling the holder to free transportation from one state to another, is, unless justified by the exceptions, an "unjust discrimination," which congress intended to prevent and punish. In other words, one of the objects of congress in this character of legislation was to do away with the pernicious practice of unjust discriminations in rates, and to break up the

odious system of favoritism and special privileges, so contrary to the principles of our government, of which one of the fundamental ideas is that all men are equal in the eyes of the law, and should be so treated. It was designed, by the act referred to, to compel common carriers of interstate commerce to discharge their public function impartially in charging for transportation; treating everybody alike, so far as that is practicable, whether in high or low station, whether public functionary or private citizen, whether rich or poor. The duty of ascertaining whether there has or has not been in this district any violation of the penal provisions of these laws to prevent unjust discriminations is, for the time being, by the law of the land, reposed in your hands; and it becomes my duty to call to your attention, and it will be yours to calmly, thoroughly, and impartially consider, a matter brought to the notice of the court upon the trial of a criminal case in the month of December of last year, and of which the court is therefore judicially advised.

While the case of the United States of America v. John Cassidy and John Mayne, popularly known as "The Strikers' Case," was on trial in this court, Mr. Frank B. Stone, who was called as a witness for the government, gave the following testimony on Thursday, December 6, 1894, which appears in volume 16 of the transcript of testimony, as follows:

"Frank B. Stone, called for the United States. Sworn. Mr. Knight: Q. You are an attorney at law? A. Yes, sir. Q. Of San Francisco? A. Yes, sir. Q. Residing at San Francisco? A. Yes, sir. Q. Will you state where you were on the 30th day of June last? A. I was in San Francisco until evening. I left on the seven o'clock train for the North. Q. What was your point of destination? A. I think I intended to leave the road at Ashland. I was accompanied by Judge J. E. Murphy, of Del Norte, going on a camping trip. We were to leave the railroad at Ashland, Oregon, and take the stage for Crescent City. Q. You are referring to Ashland in the state of Oregon? A. Yes, sir. I think it may have been beyond there. It has escaped me, the exact point we were to leave the road; somewhere in Oregon. We were to take the stage, and proceed to his ranch in the vicinity of Crescent City. Q. Did you go through to your point of destination? A. I did not. I was stopped at Red Bluff. Q. What train was this that you went up on? A. What was known as the 'Oregon Express.' Q. That is over the line of the Southern Pacific road? A. Yes, sir."

Upon cross-examination, the same witness testified as follows:

"Mr. Monteith: Q. What is your business here? A. Practicing law. Q. Anything else? A. Any other business? Q. Yes. A. No, sir. Q. Are you connected in any way with the operating department of the Southern Pacific? A. I am not in any way. Q. With the traffic department? A. No, sir; in no way, in any shape or manner. I am in a position to-day and would be glad to take any case that was brought to my office that I thought was right against that company. Q. I am asking about the mechanical department. A. In no way, shape, or manner. Q. Are you connected with the legal department in any way? A. In no way, shape, or manner. Q. Have you not tried in the last year or two to obtain a situation in connection with the legal department of the Southern Pacific? A. No, sir. Q. Have you not traveled on passes? A. I have. Q. Were you not traveling on a pass then? A. I was, with Mr. C. P. Huntington's personal pass. Q. Have you not been in the habit of having a book of passes in your office, and giving them out to people? A. No, sir. Q. During the campaign two years ago, did you not, while you were acting as manager for Mr. De Young's campaign, have in your office a book of free tickets or passes that you gave away? A. I had blank passes. Q. You issued them? A. I did on occasions. Q. You got

them from the railroad company? A. Yes, sir. Q. At that time you had some connection with the railroad company? A. None on earth. Q. How did you happen to handle these passes? A. Through my personal friendship, extending back to my partnership with A. A. Sargent, with Mr. C. P. Huntington. Q. How many passes did you give out that year?' A. I could not say; not a great many. Q. You had several books? A. I might have had several books. There were not any great number of passes."

He further testified upon cross-examination as follows:

"Mr. Monteith: Q. You went to Red Bluff on a train on June 30th? A. I left on the night of June 30th. Q. You traveled on a Pullman car? A. Yes, sir. Q. Did you have a Pullman pass? A. I did. Q. Do you remember on what account that Pullman pass was issued? Was it not issued on account of the Southern Pacific? A. No, sir. Q. On account of C. P. Huntington? A. No, sir; it was a personal favor extended to me. I have said Mr. C. P. Huntington is my personal friend. Any favors I have received have been received through his 'personal influence. The Court: Mr. Monteith is asking about a Pullman pass. A. I understand. Mr. Monteith: Q. Was your Pullman pass an annual or a trip pass? A. An annual. Q. Does not the pass say on it— Have you it with you? A. No, sir; it does not say anything. Q. See if I cannot refresh your memory. Does it not say on it, 'Pass Frank M. Stone on account of' so and so? A. Absolutely not. If you would like to be enlightened, I can show you my pass, and bring the other. Here is Mr. Huntington's pass: 'Southern Pacific Company: Pass Frank M. Stone over lines of Southern Pacific Company. 1894 until December 31st, unless otherwise ordered. C. P. Huntington.' It is as good in Texas as it is in California, and over any line wherever a Southern Pacific engine runs, and has been given me something like ten years, by Mr. C. P. Huntington personally. There is nothing issued to me in any other way. Q. You are not employed by the Southern Pacific Company? A. In no way, shape, or manner. Q. By any other railroad company? A. No, sir. Q. Did you ever advise Mr. Huntington that the issuance of that pass was in contravention of the interstate commerce act? A. No, sir. Q. Those other passes that you spoke about—those books of passes—were all on your personal account? A. Absolutely; to me personally. No one could have issued one under any circumstances except myself, and they were given to me as a personal favor, and at my personal request. Q. Those were in the form of tickets? A. Blank tickets. Q. Two inches long, and about an inch wide? A. They were not passes. They were tickets. I should judge that was about the size. Q. They had the stamp of the general passenger and ticket agent on the back? A. Yes, sir. Q. The blanks in them were simply the points of beginning and the points of destination? A. Yes, sir, they were simply tickets; they were not passes. Q. They were free tickets, given away without compensation? A. By myself? Q. Yes. A. Yes, sir; I never received anything for any of them."

You will observe that Mr. Stone testifies that his destination was Ashland, in the state of Oregon, or to some place beyond in that state. He was therefore on a journey that carried him from this state into another, bringing his transportation within the laws of the United States relating to interstate commerce. It will be noticed, further, that Mr. Stone does not claim to belong to any of the excepted or privileged classes mentioned in section 22 of the interstate commerce act. His claim is that the pass was given to him as a matter of personal favor and friendship. You will therefore carefully examine all the facts in this case, and ascertain to what extent the pass system has been employed, if at all, by the officers of the Southern Pacific Company, in favoring individuals not entitled to such favors under the law in the matter of free transportation beyond the boundary of the state.

In each judicial district there is a United States attorney, appointed by the president, to represent the interests of the government in the prosecution of parties charged with the commission of public offenses against the laws of the United States. The United States attorney for this district will therefore appear before you, and present the accusations which the government may desire to have considered by you. He will point out to you the laws, other than those I have mentioned, which the government deems to have been violated, and will subpoena for your examination such witnesses as he may consider important, and also such other witnesses as you may direct. To constitute a legal grand jury, at least 16 of your number must be present; and not less than 12 must concur to authorize you to find an indictment or make a presentment; a majority will not be sufficient. In your investigations, you will receive only legal evidence, to the exclusion of mere reports, suspicions, and hearsay evidence. Subject to this qualification, you will receive all the evidence presented which may throw light upon the matter or matters under consideration, whether it tend to establish the innocence or guilt of the accused. And more: if, in the course of your inquiries, you have reason to believe that there is other evidence not presented to you within your reach, which would qualify or explain away the charge under investigation, it will be your duty to order such evidence to be produced. Formerly it was held that an indictment might be found if evidence were produced sufficient to render the truth of the charge probable. But a different and a more just and merciful rule now prevails. To justify the finding of an indictment, you must be convinced, so far as the evidence before you goes, that the accused is guilty. In other words, you ought not to find an indictment unless, in your judgment, the evidence before you, unexplained and uncontradicted, would warrant a conviction by a petit jury. You will regulate the time of your sessions to accommodate the convenience of yourselves and the district attorney, but you will not adjourn for a period of more than four days without the permission of the court. In the progress of your examinations, should questions arise concerning which you may desire further instructions from the court, you may come into court for that purpose, and the law will be further explained to you with respect to such questions.